AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information Associated with the Account<br>"mallen@mdxdiagnostics.net" that Is Stored at Premises<br>Controlled by Microsoft Corporation | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  19- **MJ - 92** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ Louisiana _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:1347 | Health Care Fraud |
| 18:1349 | Conspiracy to Commit Health Care Fraud |
| 42:1320a-7b | Soliciting and Receiving Kickbacks Involving a Federal Health Care Program |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Wes Root, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8/9/19

_____
*Judge's signature*

City and state:  Baton Rouge, Louisiana

Richard L. Bourgeois, Jr., U.S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

IN THE MATTER OF THE SEARCH OF  :
INFORMATION ASSOCIATED WITH THE  :    MAGISTRATE NO. 19- **MJ-92**
ACCOUNT "mallen@mdxdiagnostics.net"  :
THAT IS STORED AT PREMISES  :    **UNDER SEAL**
CONTROLLED BY MICROSOFT  :
CORPORATION  :

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

Your Affiant, Special Agent Wes Root, being duly sworn, deposes and says as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with the email account "mallen@mdxdiagnostics.net" (the "TARGET ACCOUNT"), which is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation ("Microsoft"), an email, website, and cloud services provider that is headquartered at One Microsoft Way, Redmond, Washington 98052.  The information to be searched is described in the following paragraphs and in Attachment A, attached hereto and incorporated as if fully set forth herein.  This affidavit is made in support of an application for a search warrant under the Stored Communications Act, Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require Microsoft to disclose to the government copies of the information (including the content of communications) further described in Attachment B, attached hereto and incorporated as if fully set forth herein.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.    I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), assigned to the Dallas Region's Baton Rouge

Field Office since January 2015 and have been so employed since August 2010. Additionally, I am an attorney licensed to practice in Louisiana (Bar #34064). Prior to joining the Baton Rouge Field Office, I served in on multiple details including to the Office of Counsel to the Inspector General and as a Special Trial Attorney for the United States Department of Justice. During my tenure as a federal law enforcement officer, I have worked cases with federal, state, and local agencies and have used numerous investigative techniques, including, but not limited to, electronic surveillance, physical surveillance, interviews of witnesses, use of confidential informants, analysis of phone, bank, and other records, and execution of search and seizure warrants.

3.     As a Special Agent with the HHS-OIG, I am currently tasked with conducting investigations into violations of federal health care fraud laws. I have received extensive training in investigations of fraud related to the United States health care system, including schemes to defraud Medicare and Medicaid. Since 2015, I have been participating in the DOJ's Baton Rouge Medicare Fraud Strike Force, which includes Special Agents from HHS-OIG and the Federal Bureau of Investigation, as well as Investigators from the Louisiana Department of Justice Medicaid Fraud Control Unit. In that role, I have participated in the execution of search and seizure warrants in cases involving violations of federal law including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program).

4.     I am personally involved in this investigation along with other federal agents. The statements contained in this affidavit are based upon a review of both public and private records and interviews conducted by me and other federal agents of witnesses knowledgeable about the facts underlying this investigation. Because this affidavit is provided for the limited purpose of

2

establishing probable cause for a search warrant, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause.

     5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that from in or around January 1, 2018 and continuing through the present, Mark Allen ("ALLEN"), the person using, receiving, and sending information from the TARGET ACCOUNT, and others, violated Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program) (collectively, the "TARGET OFFENSES"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes, further described in Attachment B.

## II.    JURISDICTION

     6.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As set forth below, acts in furtherance of the offenses under investigation occurred within the Middle District of Louisiana, including the submission of fraudulent claims to Medicare for laboratory services that were not medically necessary and that were procured through unlawful kickback payments. *See* 18 U.S.C. § 3237(a).

3

### III.    THE MEDICARE PROGRAM

7.    Medicare is a federally funded health insurance program that provides health benefits to individuals who are 65 years of age or older or disabled, and it is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).  Medicare is administered by HHS through its agency, the Centers for Medicare and Medicaid Services ("CMS").

8.    Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D").  Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

9.    "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries.  In order to bill Medicare, a provider must submit an enrollment application to Medicare.  The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare.  Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

10.    A Medicare "provider number" is assigned to a provider upon approval of the provider's Medicare application.  A provider may use that provider number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries.

11.    Medicare contracts with private companies in various jurisdictions to process claims, determine coverage rules, and provide reimbursement.  Medicare currently contracts with Novitas Solutions, Inc. ("Novitas") to administer the Medicare program in Louisiana, including

4

the enrollment of providers and the processing of claims for services rendered to Medicare beneficiaries.

12.    This investigation concerns claims submitted to Medicare for Part B laboratory services, namely, cancer genetic testing.

13.    The Social Security Act, Title 41, United States Code, Section 1395y(a)(1)(A) states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member." As a condition of Medicare payment, a physician or other Medicare provider must certify that the services performed were medically necessary.  42 U.S.C. § 1395n(a)(2)(B).

14.    Further, Title 42, Code of Federal Regulations, Section 410.32(a) provides, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

15.    When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

## IV.    TARGET OFFENSES

### Health Care Fraud

16.    Title 18, United States Code, Section 1347 prohibits health care fraud.  It provides, "Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

    a.    to defraud any health care benefit program; or

    b.    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both."

17.    Title 18, United States Code, Section 1349 provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those set forth in Title 18, United States Code, Section 1347.

18.    Title 18, United States Code, Section 24(b) defines a "health care benefit program" as "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

### Federal Anti-Kickback Statute

19.    The Federal Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b, prohibits the payment or receipt of "any remuneration" in exchange for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."

20.     When enrolling as a Medicare provider, physicians, clinical laboratories, and others must certify that they will comply with the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute.

## V.     MEDICARE COVERAGE FOR CANCER GENETIC TESTING

21.     Clinical laboratories offer cancer genetic tests, also referred to as "CGx," in order to identify hereditary cancer risks. These tests can indicate an increased risk of developing certain cancers in the future and can help providers determine the appropriate course of treatment for a person diagnosed with cancer. However, the tests do not detect existing cancer.

22.     Medicare regulations provide coverage for certain cancer screening tests of beneficiaries, such as mammograms and colonoscopies. However, cancer genetic testing, which does not screen for existing cancer but indicates a risk of developing certain cancers in the future, is covered by Medicare only when there is a personal history of cancer (as opposed to a family history of cancer), the testing is ordered by a treating physician, and the testing is medically necessary. Of course, even though Medicare does not cover cancer genetic testing when there is no personal history of cancer, individuals may still to choose to undergo such testing and pay for it through other means.

23.     Medicare publishes guidance regarding what services it does and does not cover in a variety of publications, including National Coverage Determinations ("NCDs").

24.     Specifically regarding cancer genetic testing, Medicare issued NCD 90.2 (Next Generation Sequencing) (effective Mar. 16, 2018). NCD 90.2 states, "Clinical studies show that genetic variations in a patient's cancer can, in concert with clinical factors, predict how each individual responds to specific treatments." Results of genetic testing can "contribute to predicting a patient's response to a given drug: good, bad, or none at all." In other words, for a beneficiary

who has been diagnosed with cancer, genetic testing can assist with that patient's treatment. Accordingly, under NCD 90.2, Medicare covers genetic testing using Next Generation Sequencing as "reasonable and necessary" so long as: the testing is "ordered by a treating physician"; the beneficiary has "either recurrent, relapsed, refractory, metastatic, or advanced stage III or IV cancer"; and the beneficiary has "decided to seek further cancer treatment," among other requirements. In NCD 90.2, Medicare made it clear to providers that Medicare does not reimburse for genetic testing performed to determine the likelihood that a beneficiary will develop cancer in the future. Rather, Medicare will only pay for genetic testing performed to aid in the treatment of a beneficiary with a current personal diagnosis of cancer.

25.    Novitas is the Medicare Administrative Contractor for Medicare's Jurisdiction JH, which includes Louisiana and surrounding states. Medicare Administrative Contractors such as Novitas issue Local Coverage Determinations ("LCDs") governing reimbursement of services in the contractors' coverage areas.

26.    In 2015, Novitas issued LCD L35062 (Biomarkers Overview) (effective Oct. 1, 2015), which governs the circumstances in which Medicare considers genetic testing medically necessary (and thus properly reimbursable). Under LCD L35062, "Medicare considers genetic testing medically necessary to establish a molecular diagnosis of an inheritable disease when all of the following criteria are met:"

- "The beneficiary must display clinical features of an associated disease, but . . . molecular testing for carrier status or family studies is considered screening and is statutorily excluded from coverage; and

- The result of the test will directly impact the treatment being delivered to the beneficiary; and

- A definitive diagnosis remains uncertain after history, physical examination, pedigree analysis, genetic counseling, and completing of conventional diagnostic studies."

*Id.*

27.    In addition, Notivas issued LCD L36715 (BRCA1 and BRCA2 Genetic Testing) (effective Dec. 1, 2016).  Certain patterns of breast and ovarian cancer are linked to the BRCA1 and BRCA2 genes.  Medicare covers genetic testing of the BRCA1 and BRCA2 genes for persons with a "[p]ersonal history of breast, ovarian, pancreatic or prostate cancer," among other criteria. *Id.*  However, "[t]esting of an unaffected Medicare eligible individual or family member is considered not reasonable and necessary." *Id.*  And "BRCA1/BRCA2 genetic testing is considered not reasonable and necessary, thus it is non-covered, for . . . [g]enetic screening in the general population," as well as "[t]esting of individuals with no personal history of breast, ovarian," or certain other cancers. *Id.*  Again, "[s]uch testing is considered screening and is excluded by Medicare statute." *Id.*  As with NCD 90.2, LCD L36715 requires a personal history of cancer for genetic testing to be covered by Medicare.

28.    Other Medicare Administrative Contractors have similar LCDs.  For example, Palmetto, a Medicare Administrative Contractor for Jurisdiction JJ, issued LCD L36082 (BRCA1 and BRCA2 Genetic Testing) (effective Oct. 5, 2015), which states, "To be eligible for Medicare coverage, the individual being tested must have signs or symptoms of breast . . ., ovarian . . ., pancreatic . . ., or prostate cancer" and meet other criteria.  "Genetic testing for a known mutation in a family is a covered service for individuals with signs and/or symptoms of cancer.  Testing of an unaffected Medicare eligible individual or family member is not a covered Medicare benefit." *Id.*

29.    Further, Medicare requires that comprehensive cancer genetic testing panels derived from a single DNA swab be billed as a "bundled" test. Under Local Coverage Article A52986 (Billing and Coding: Biomarkers for Oncology), which has been in effect since October 1, 2015, a "Panel of tests" must be "bill[ed] under a single CPT code to prevent stacking of codes." *Id.* "When multiple biomarkers are performed on one specimen and ordered in the context of a set panel of tests then this scenario should be billed as the specific panel if it has its own CPT code or at 81479 if it does not have a specific CPT code." *Id.* "Billing each code separately is incorrect billing and may result in the denial of the claim." *Id.* A claim to Medicare for reimbursement that uses multiple CPT codes for each individual gene tests is considered "unbundled" billing.

30.    The difference in reimbursements is stark: Medicare reimburses approximately $900 when a comprehensive panel is properly billed as a bundle, compared to a total of up to approximately $6,500 in reimbursements when each genetic test is unbundled and billed separately.

## VI.    RELEVANT ENTITIES AND INDIVIDUALS

31.    Acadian Diagnostic Laboratories, LLC ("Acadian") is a Louisiana limited liability company with its principal place of business at 11842 Justice Avenue, Baton Rouge, Louisiana 70816, in the Middle District of Louisiana. The owner and registered agent of Acadian is Kevin Hanley. Acadian operates as a clinical laboratory that provides cancer genetic testing, and other types of testing, to Medicare beneficiaries and others. From in or around January 1, 2018 through March 31, 2019, Acadian submitted approximately $32,134,106.50 in claims to Medicare for genetic testing, of which Medicare paid approximately $5,343,279.53.

32.    Specialty Drug Testing, LLC ("Specialty Drug") is a Louisiana limited liability company with its principal place of business at 1300 Finks Hideaway Road, Monroe, Louisiana

71203. The owner and registered agent of Specialty Drug is George M. Fluitt, III. Specialty Drug operates as a clinical laboratory that provides cancer genetic testing, and other types of testing, to Medicare beneficiaries and others. From in or around January 1, 2018 through May 18, 2019, Specialty Drug submitted approximately $91,488,213 in claims to Medicare for various types of laboratory services, including genetic testing, of which Medicare paid approximately $17,555,676.

33.    Clio Laboratories, LLC ("Clio") is a Georgia limited liability company with its principal place of business at 1130 Hurricane Shoals Road NE, Lawrenceville, Georgia 30043. The registered agent of Clio is Jordan Satary, but on information and belief, Khalid Satary owns, operates, and/or controls Clio. Clio operates as a clinical laboratory that provides cancer genetic testing, and other types of testing, to Medicare beneficiaries and others. From in or around January 1, 2018 through February 27, 2019, Clio submitted approximately $63,497,725 in claims to Medicare for various types of laboratory services, including genetic testing, of which Medicare paid approximately $11,465,591.

34.    Lotus Health Telemed LLC ("Lotus Health") is a Florida limited liability company with its principal place of business at 18268 50th Street, Loxahatchee, Florida 33470. According to its Articles of Organization, Lotus Health operates as a "telemedicine doctor referral service."

35.    Archer Diagnostics LLC ("Archer") is a South Carolina limited liability company with its principal place of business at 300B American Legion Road, Greer, South Carolina 29651. The registered agent of Archer is ALLEN. Archer operates as a medical sales and marketing company.

36.    JL Medical LLC, doing business as JL Billing, LLC ("JL Billing") is a South Carolina limited liability company with its principal place of business at 300B American Legion

Road, Greer, South Carolina 29651 (i.e., the same address as Archer). The registered agent of JL Billing is ALLEN. JL Billing operates as a medical billing company.

37. ALLEN is a resident of South Carolina. ALLEN owns, operates, and/or controls Archer and JL Billing. According to Cooperating Witness 1, who is described below, ALLEN is also a part owner of Acadian and has an interest in Specialty Drug. ALLEN corresponds using the TARGET ACCOUNT.

38. Richard (or "Rick") Epstein ("Epstein") is a resident of Florida. Epstein, along with ALLEN, owns, operates, and/or controls Archer and JL Billing.

39. Kevin Hanley ("Hanley") is a resident of Prairieville, Louisiana. Hanley owns, operates, and/or controls Acadian.

40. George M. ("Trey") Fluitt III ("Fluitt") is a resident of Sterlington, Louisiana. Fluitt owns, operates, and/or controls Specialty Drug.

41. Khalid Satary ("Satary") is a resident of Suwanee, Georgia. Based on information and belief, Satary owns, operates, and/or controls Clio.

42. Cooperating Witness 1 ("CW1") is a resident of Madisonville, Louisiana. Since approximately 2017, CW1 served as the Chief of Operations of Company 1, a Mississippi-based clinical laboratory, and, as of approximately January 2019, CW1 served as the interim Chief Executive Officer of Company 2, a Louisiana-based clinical laboratory. Prior to 2017, CW1 was an owner and the Chief Operating Officer for Company 3, a Louisiana-based clinical laboratory that CW1 helped found in approximately 2012 or 2013.

43. Cooperating Witness 2 ("CW2") is a resident of Harahan, Louisiana. CW2 is the owner of Company 4, a durable medical equipment company located in Louisiana. CW2 has been in the medical device industry for approximately 30 years.

12

## VII.    PROBABLE CAUSE TO BELIEVE THAT A CRIME HAS BEEN COMMITTED

### Summary

44.    CW1, in his/her role as a corporate executive of multiple clinical laboratories, encountered a multi-million dollar unlawful cancer genetic testing conspiracy involving: ALLEN, who operates and/or controls Archer and JL Billing; Epstein, who operates and/or controls the same companies; certain clinical laboratory owners, including Hanley (who operates and/or controls Acadian, which is located in the Middle District of Louisiana), Fluitt (who operates and/or controls Specialty Drug), and Satary (who operates and/or controls Clio); and others.

45.    The investigation has revealed that ALLEN and others, through Archer, received illegal kickbacks and bribes from clinical laboratories, including Acadian, Specialty Drug, and Clio, dating from at least January 2018 to the present, in exchange for the referral of Medicare beneficiaries for cancer genetic testing that was medically unnecessary, not prescribed by a treating physician, and not covered by Medicare.  The investigation has further revealed that unlawful claims were made to Medicare by Acadian (in the Middle District of Louisiana), Specialty Drug, and other clinical laboratories for such medically unnecessary testing.

46.    This scheme supplies probable cause to believe that one or more crimes have been committed by ALLEN, who used the TARGET ACCOUNT in doing so.

### The Fraudulent Scheme: ALLEN and His Co-Conspirators
### Illegally Sell False Requisitions from Lotus Health through Archer and
### Ultimately to Clinical Laboratories, Including Acadian, Specialty Drug, and Clio

47.    In order to submit claims to Medicare for performing genetic testing, providers generally need: (1) beneficiaries who provide their personal information, insurance information, and DNA samples; and (2) prescriptions issued by physicians or other qualified providers for cancer genetic testing, also known as "requisitions."

13

48.    According to CW1, ALLEN, through his company Archer, sells completed DNA swabs collected from Medicare beneficiaries along with signed requisitions to various clinical laboratories, including Acadian (in the Middle District of Louisiana), Specialty Drug, Clio, and others.  In return, the clinical laboratories, including Acadian, pay Archer either a fixed rate of payment per sample (in some cases $800 or $1200 per sample), or a percentage of the Medicare reimbursements paid to the laboratory for each test (in some cases a cut of 50% to 85% of the Medicare reimbursement per test).

49.    These illegal payments, which violate the Federal Anti-Kickback Statute, are documented in "marketing services contracts" between Archer and the clinical laboratories, including Acadian, which were provided to the government by CW1 and are detailed below.

50.    CW1 directly observed this scheme through his interactions, including by email, with ALLEN.  CW1 was interviewed by the government regarding this scheme multiple times in June and July, 2019.

**ALLEN's Proposed Sale of 70 Requisitions to Company 1**
**in Exchange for Illegal Kickbacks**

51.    Specifically, CW1 stated that in May or June of 2018, Archer, through ALLEN, offered to sell 70 cancer genetic testing requisitions and DNA samples to Company 1, the clinical laboratory where CW1 worked as the Chief Operating Officer.  ALLEN first suggested to CW1 that in return, Company 1 would pay Archer a fee of 85% of the total amount of net reimbursements for cancer genetic testing paid by Medicare, after subtracting the expense of the tests.  As part of this proposed exchange, ALLEN required that Company 1 use JL Billing, the medical billing company owned by ALLEN and Epstein, to submit claims to Medicare for cancer genetic testing on behalf of Company 1.  Company 1 refused.  Then, ALLEN offered that Company 1 would pay Archer a flat rate fee of $800 to $1200 per sample.  Company 1 again refused.  Finally,

ALLEN offered the samples to Company 1 to perform cancer genetic testing on a trial basis, and Company 1 agreed to process the tests (though not to bill Medicare).

52.     As part of the exchange, ALLEN provided requisitions for the 70 tests to Company 1. After reviewing the requisitions and discussing ALLEN's business practices with ALLEN, Company 1 ultimately refused to submit claims to Medicare for the 70 tests.

53.     As set forth above, Medicare does not reimburse cancer genetic tests based on family history of cancer alone; a personal history of cancer is required for cancer genetic testing to be reimbursable. *See* NCD 90.2; LCD L36715. According to Company 1's review of the requisition forms ALLEN provided, it appeared that many of the beneficiaries did not have a personal history of cancer. A representative example of these requisitions, which were provided to the government and reviewed by Affiant, is as follows:

- A "Next Gen Sequencing Requisition" was prepared for beneficiary C.M., who resides in Oklahoma.

- The "Sending Facility" is listed as "Lotus Health."

- The requisition is signed by beneficiary C.M. on July 10, 2018.

- The requisition is then electronically signed by the "Ordering Physician," who in this example resides in Texas, six days later, on July 16, 2018.

- The order for testing has a check next to the box, "Diagnostic (history of cancer or polyps)." Two ICD-10 codes (a standardized system for coding of medical diagnoses) are listed here. The two codes relate to family history of cancer and an encounter for genetic testing.

- The "Patient Clinical History," which would include any personal history of cancer, is left blank.

15

- The "Family History" of cancer is filled out; in this example, it lists an Aunt (Paternal) who was diagnosed with pancreatic cancer at age 60.

- Finally, a "Next-Gen Sequencing Multi-Gene with BRCA1/2" test, a type of multi-gene test panel, is ordered by the physician. According to the test descriptor, this panel includes genetic testing for 32 different genes, including BRCA1, BRCA2, and others.

54.    A snapshot of this representative requisition is below. This example, and many others, show no *personal* history of cancer, but only a family history of cancer.

55.     In addition, it appeared that the providers who signed the requisitions that ALLEN provided to Company 1 had mass-produced and rubber stamped the requisitions.  Timestamps on the requisition signatures reviewed by Affiant indicated that physicians tended to batch-sign numerous forms on the same day.  Also, the beneficiary signatures generally pre-dated the signatures of the ordering physicians.

56.     Similarly, each requisition appeared to have a generic letter of medical necessity written by the provider.  Other than changing the beneficiary information, the letters typically followed the following template, stating in part:

- "I am writing this letter on behalf of [beneficiary] to support coverage for genetic testing.  I have determined that this test is medically necessary for the above-named patient due to a family and/or personal history of cancer that can lead to susceptibility of cancer based on genetic factors."

- "I have determined that a multi-gene panel is the best course of action for the patient as it offers increased sensitivity compared to testing for a select few genes."

- "The specific personal and/or family history of the patient is included on the laboratory test requisition form."

- "Based on my review of the personal and/or family history, . . . I deem this medically necessary."

57.     CW1 provided these 70 requisitions and letters of medical necessity to the government, and Affiant's review of the requisitions and letters confirms the observations listed above.

58.     Affiant's review of the requisitions and letters of medical necessity further revealed that multiple providers signed the letters and attested to the medical necessity of the requisitions.

17

Timestamps on the requisition signatures reviewed by Affiant indicated that physicians tended to batch-sign numerous forms on the same day. Upon information and belief, these physicians logged into an electronic portal maintained by Lotus Health to electronically sign requisitions and letters for a list of patients. These physicians were located in various parts of the country, and would authorize genetic testing for beneficiaries located in different states. For example, among the 70 requisitions provided to CW1 by ALLEN, Dr. Daniel Ramiro Canchola, located in Irving, Texas, electronically ordered genetic testing for beneficiaries located in California, Wisconsin, Wyoming, and elsewhere.

**ALLEN's Use of Lotus Health to Obtain Medically Unnecessary Requisitions**

59.     According to CW1, in late 2017 or early 2018, prior to sending the 70 requisitions, ALLEN had explained to CW1 that Archer used Lotus Health to obtain the requisitions. As ALLEN explained it to CW1, ALLEN and Epstein own durable medical equipment companies that run television and internet advertisements. These advertisements tout the provision of back and knee braces to Medicare beneficiaries at little or no charge. Medicare beneficiaries, lured by this promise, call in to a call center to request the equipment, and are asked to provide their Medicare and other personal information.

60.     CW1 stated that ALLEN and Epstein's call center employees, who are not licensed medical professionals, conclude this call by asking whether the beneficiary has a personal or family history of any type of cancer. If a beneficiary notes any history of cancer—personal *or* family— the beneficiary is offered a "free" hereditary cancer screening test, and is told that the test will be paid for by Medicare. If this "free" test is accepted, the beneficiary's contact and Medicare information are then transferred to Lotus Health, a telemedicine company used by ALLEN and Epstein so that cancer genetic testing may be ordered.

18

61. According to CW1, ALLEN told him that once patient demographic information is gathered by the call center, Lotus Heath providers sometimes contact the Medicare beneficiaries and collect further information needed to order cancer genetic testing, including: (1) whether the beneficiary has or had cancer, the type of cancer, and the diagnosis information; and (2) whether anyone in the beneficiary's family has or had cancer, the type of cancer, and the diagnosis date. Lotus Health providers enter the corresponding information and diagnosis codes on a requisition, an example of which is in Paragraph 54 above.

62. Once the above information has been gathered, a requisition is mailed to the beneficiary for signature, along with a DNA collection kit containing cotton swabs and a specimen bag, in a pre-addressed, pre-paid package. Beneficiaries are asked to swab the inside of their cheek, deposit the DNA sample in the specimen bag, sign the requisition, and mail all of the above back to Lotus Health.

63. In February and March 2019, in another investigation, agents interviewed three physicians who authorized genetic testing through Lotus Health. According to these physicians, they logged into a Lotus Health portal, where there would be a list of patient names for whom the doctors were to perform a consultation to authorize genetic testing. The portal provided basic beneficiary information to the physicians. Two of the physicians hired through Lotus Health reported that they never contacted the beneficiaries after the genetic testing was completed to go over the results with the beneficiary. The third physician stated that s/he contacted only 25-30% of the beneficiaries to go over the results. The physicians stated that Lotus Health informed them that the results would be sent to the beneficiary's primary care physician, who would discuss the results. The Lotus Health physicians did not explain why beneficiaries with a primary care physician would need a telemedicine doctor to order the genetic testing, rather than having the

primary care physician order the testing. None of the Lotus Health physicians had specific training in genetics or genetic testing.

64.    A telemedicine doctor who never sees a beneficiary, never treats a beneficiary before or after a genetic test, and never uses the results of genetic testing in the management of a beneficiary's specific medical problem is not a "treating physician."    42 C.F.R. § 410.32(a). Genetic tests billed to Medicare based on requisitions from such telemedicine doctors are not properly reimbursable.

65.    In addition, the beneficiary signatures on the hundreds of Lotus Health requisitions provided to the government by CW1 usually pre-date the signature of the ordering physician, meaning that testing was ordered after a testing kit was shipped to and completed by the beneficiary.    However, the normal course of medical practice would be for a provider's authorization for a test to be the first step in a beneficiary receiving a test. This backwards practice further calls into question the medical necessity of the genetic testing ordered.

**ALLEN's Sale of the 70 Requisitions to Specialty Drug in Return for Illegal Kickbacks**

66.    According to CW1, Company 1 performed the lab tests for the 70 samples that ALLEN had provided to Company 1 in May or June of 2018.  However, after reviewing the requisition forms and learning of ALLEN's business practices, Company 1 ultimately refused to submit claims for reimbursement to Medicare for the cancer genetic testing performed on ALLEN's samples.

67.    However, according to CW1, Fluitt, the owner of Specialty Drug, offered to pay Company 1 for the cost of the tests and to collect the reimbursements from Medicare. Fluitt told CW1 that Specialty Drug regularly accepts cancer genetic testing requisitions from telemedicine companies, including Lotus Health.

68.      According to CW1, in approximately June 2018, ALLEN took some of the hard copy requisitions for the 70 samples from CW1 and delivered them to Fluitt, and shortly thereafter, Specialty Drug submitted claims to Medicare for having performed cancer genetic testing for those beneficiaries, despite that Specialty Drug had not yet received the test results from Company 1.

69.      According to CW1, in October 2018, CW1 sent the requisitions provided by ALLEN, the test results, and Company 1's bank information to Fluitt.  Fluitt then reimbursed Company 1 for the cost of the tests run by Company 1.

70.      An email between CW1 and Fluitt confirms this transaction.  On October 1, 2018, CW1 emailed Fluitt regarding "Reference samples," writing, "Trey, We ran 72 samples for you on the CGX testing through Mark Allen, below is what we are owed.  $41,400."  On the same date, Fluitt responded, "Got it [CW1], can you send me a w-9."

71.      On October 11, 2018, Fluitt checked in with CW1 on the results of the Lotus Health samples, writing, "Hey [CW1] sorry so late, but I never got email on the 72 samples.  Can you give me an update."  The next day, October 12, 2018, CW1 emailed to Fluitt a spreadsheet listing the 70 cancer genetic tests that Company 1 performed based on the requisitions and samples provided by ALLEN.  Also, according to CW1, once Fluitt paid Company 1 for the cost of the genetic testing, CW1 provided Fluitt with the results of the tests.

72.      CW1 provided the above emails, spreadsheet, requisitions forms, and cancer genetic testing results to the government.

73.      According to CW1's conversations with ALLEN and Fluitt, Medicare reimbursed Specialty Drug between approximately $4,100 and $6,500 per test.

74.      Affiant's review of Medicare claims data associated with Specialty Drug corroborates CW1's statements.  The data shows that Specialty Drug did in fact submit claims to

21

Medicare for cancer genetic testing performed on several of the 70 requisitions and samples associated with the requisitions initially provided by ALLEN. For example, for beneficiary D.C., Specialty Drug billed Medicare for having performed genetic testing on June 3, 2018, and was reimbursed $6,693.47 in January 2019.

75.    CW1 also provided to the government an unsigned copy of an "Independent Contractor Agreement," dated May 30, 2018, between Archer and Specialty Drug that had been given to CW1 by ALLEN, when ALLEN was seeking to persuade CW1 to submit claims for the 70 requisitions in exchange for payment. The contract states that in consideration of Archer's "services," Archer shall be compensated with "50% of NET" payments for "CGx tests performed" (i.e., cancer genetic testing) by Specialty Drug each month. The contract shows that, assuming an expected Medicare claim success rate of 90%, both Archer and Specialty Drug will each earn $842,500 per 500 genetic testing claims submitted. This compensation agreement—which is found at "Exhibit A" to the unsigned contract between Archer (referred to as "Contractor" and "Rep.") and Specialty Drug (referred to as "Lab")—is excerpted below:

"Exhibit A"

On or by the 10th of the month Contractor will receive report showing gross collection for
CGx tests performed.

On or by the 15th Lab will execute payment according to the following terms:

Billing will be done by JL Billing at 5%.

GROSS collections will vary between $4,100-$6,200.00

LESS-(COGS) Cost $525/test Otogentics-$225 Kailos

50% of NET to Rep.

See Example Below

| | Month Samples |
|---|---|
| Expect 90% claim success | |
| Sample Count | 500 |
| | |
| Reimbursement $4100 (21 Days) | $2,050,000.00 |
| | |
| Cost (could reduce by 50% Kailos) 90% Pay | -$262,500.00 |
| Billing 5% | -$102,500.00 |
| Net | $1,685,000.00 |
| 50% of Net-Rep | $842,500.00 |
| | |
| Margin | $842,500.00 |

76.    Based on CW1's conversations with ALLEN and Fluitt, in accordance with Specialty Drug's contract with Archer, Specialty Drug paid Archer 50% of the net Medicare reimbursements associated with the 70 samples. A review of bank records for Archer shows that Specialty Drug made payments to Archer after submitting claims to Medicare for the samples.

**ALLEN's Proposed Sale of 243 Requisitions to Company 1 in Exchange
for Illegal Kickbacks, and Ultimate Sale of Those Requisitions to
Acadian in Exchange for Illegal Kickbacks**

77.    After sending Company 1 the initial 70 samples, ALLEN asked CW1 if Company 1 would test a second group of 243 samples. ALLEN sent CW1 the cancer genetic testing requisitions for this second group of Medicare beneficiaries. According to CW1's review, around

23

179 requisitions, or approximately 75%, indicated no personal history of cancer. Affiant's own review of the requisitions, which were provided to the government, confirms this finding. Company 1 declined to test the samples.

78.    According to CW1, in a later telephonic conversation, ALLEN told CW1, "You missed out. Acadian took those specimens and they will do well off them." CW1 understood this comment to mean that Hanley, owner of Acadian, located in the Middle District of Louisiana, accepted the samples in exchange for kickback payments, and that Acadian processed the tests and submitted claims to Medicare.

79.    CW1 provided to the government an unsigned copy of a "Laboratory Sales Representative Distribution Agreement," dated in one place April 4, 2016, and in another 2018, between Archer and Acadian. CW1 recalls that this contract was likely provided to him in hard copy by ALLEN. This contract had been provided by ALLEN to CW1 when ALLEN was attempting to persuade CW1 to test the initial batch of 70 samples. The contract states that in consideration of Archer's services, Archer will be paid "50% Net Collections" per "CGX Specimen" (i.e., cancer genetic testing specimen). This compensation agreement—which is found at "Exhibit B" to the unsigned contract—is excerpted below:

**EXHIBIT B PRECENTAGE FEE SCHEDULE**

1. Presumptive and Definitive (Screening and Confirmation) Urine/ Saliva drug testing Panel, Infectious Disease, Blood & PGX/CGX

| >1 | 50% Net Collections after $550 COG per CGX Specimen<br>50% Net Collections after $190 COG per Infectious Diseases Specimen (no overread)<br>50% Net Collections after $250 COG per Blood Wellness<br>50% Net Collections After $60 COG per Urine (Screening and Confirmation) |
|---|---|

80.     The unsigned contract between Archer and Acadian also stated that Archer (defined as "SALES REP") would comply with all applicable federal and state laws and regulations, including the Anti-Kickback Statute. ALLEN's provision of this document to CW1 indicates that ALLEN was aware of the Anti-Kickback Statute.

81.     In summary, both the draft agreement between Archer and Specialty Drug, and the draft agreement between Archer and Acadian, which ALLEN provided to CW1, entitle Archer to receive a volume-based commission of 50% of the net reimbursements paid by Medicare for each cancer genetic testing requisition and sample referred to Specialty Drug or Acadian.

82.     A review of bank records for Archer, which were obtained pursuant to grand jury subpoena, shows that Acadian made numerous, substantial payments to Archer. For example, from January 2018 through December 2018 alone, bank records for Archer show that Acadian made approximately 36 wire transfers to Archer, at an account where ALLEN has signature authority, including for sums as large as $500,000 and $600,000 per wire transfer. The "originator" information for the wire transfers shows that the payments came from Acadian's checking account based in Baton Rouge, Louisiana.

83.     ALLEN's statement to CW1 that "Acadian took those samples," as well as the numerous and substantial payments from Acadian to Archer, further indicates that Acadian conducted testing of these samples at its laboratory in Baton Rouge, in the Middle District of Louisiana.

84.     Affiant's review of Medicare claims data associated with Acadian confirms that Acadian billed Medicare for cancer genetic testing performed on several of the 243 samples referenced above in Paragraph 77 that ALLEN sold to Acadian. For example, on August 4, 2018, Acadian submitted claims to Medicare for beneficiary J.M. for having performed eleven different

types of cancer genetic tests. Beneficiary J.M.'s requisition was provided to CW1 by ALLEN, and subsequently provided to the government by CW1. The requisition does not indicate any personal history of cancer. The name of the provider who submitted the claims is "Acadian Diagnostic Laboratories, LLC," which is located in the Middle District of Louisiana. Additionally, the National Provider Identifier used on the claims is associated with Acadian in the Middle District of Louisiana. For beneficiary J.M., Acadian billed $16,870 for performing the genetic tests, and was reimbursed $4,026.91 by Medicare.

**Illegal Kickback Agreement Between Archer and Clio Dated January 2018**

85.    According to CW1, ALLEN introduced him/her to Satary, who, upon information and belief, owns and/or controls Clio, in around August 2018, when Satary sought to purchase Company 1. Although a purchase did not occur at that time, Satary described his business model to CW1, which was similar to how ALLEN had described his own business model. Satary told CW1 that among other things, he owned or controlled multiple laboratories that conduct cancer genetic testing and submitted claims to Medicare for those tests. Satary further told CW1 that his laboratories pay independent sales representatives a volume-based fee for cancer genetic testing samples and use telemedicine companies to collect the samples.

86.    Satary provided CW1 with an unsigned "Laboratory Services Distribution Agreement," dated January 5, 2018, between Clio, a lab he owns and/or controls, and Archer, owned and/or controlled by ALLEN, as an illustration of an agreement between a laboratory and an independent marketing consultant. CW1 provided a copy of this agreement to the government. The agreement states that in consideration of Archer providing "Sales Services," Archer will receive between $800 and $1200 for "Cancer Panels" (i.e., cancer genetic screening tests) performed by Clio. This compensation agreement—which is found at "Exhibit B" to the unsigned contract between Archer and Clio—is excerpted below:

26

**EXHIBIT B**
**FLAT FEE SCHEDULE**

1. Presumptive (Screening) urine/ Saliva drug testing Panel

| >1 | $15.00 |
|---|---|

2. Definitive (Confirmation) urine/ Saliva drug testing Panel

| >1 | $ 25.00 |
|---|---|

3. Presumptive and Definitive (Screening and Confirmation) urine/ Saliva drug testing Panel

| >1 | $45.00 |
|---|---|

4. Pharmacogenetics Panel (PGX)

| >1 | $150.00 |
|---|---|

5. Inherited Cancer Panel (**Comprehensive Inherited Cancer Panel**)

| >1 | $1200.00 |
|---|---|

6. Inherited Cancer Panel (**Single Panel**: BRCA1/2, Breast and Ovarian Cancer, Colorectal Cancer, Lynch Syndrome)

| >1 | $800.00 |
|---|---|

87.    A review of bank records for Clio's corporate account, which were obtained pursuant to grand jury subpoena, show payments from Clio to Archer beginning in or around January 2018.

88.    On March 15, 2018, ALLEN, using the TARGET ACCOUNT, sent an email to CW1, attaching an unsigned contract between Archer and Clio.  Like the unsigned contract described in Paragraph 86 above, this contract establishes that Clio will pay Archer a flat fee of $1200 for each comprehensive cancer genetic testing panel referral.

**CW1's Recorded Calls with ALLEN**

89.    On June 29, 2019, CW1, at the direction of the government, placed a recorded call to ALLEN.  Among other things, ALLEN discussed a health care fraud "opinion letter" that came out in approximately May 2018 regarding Medicare reimbursement of cancer genetic testing.

ALLEN said the letter was "scary as hell," because it says "that you have to have an existing relationship with that patient, an ongoing relationship, you have to have treatment of that patient, and if not, it's considered not testing, but screening; Medicare doesn't pay for screening."

90.    On July 9, 2019, CW1, at the direction of the government, placed another recorded call to ALLEN. Among other things, ALLEN again discussed the "opinion letter," and said he is "terrified." ALLEN said he has "stopped" using telemedicine companies to obtain requisitions for cancer genetic testing. He mentioned that he had "turned up" some new business that does not involve use of telemedicine to obtain requisitions; instead, physicians perform a "face-to-face patient encounter," which ALLEN called "the real deal." ALLEN acknowledged that he done "a lot—like a lot" of business using telemedicine in the past.

## VIII.  PROBABLE CAUSE TO SEARCH THE TARGET ACCOUNT

91.    On May 22, 2019, the government served Microsoft, the provider of the TARGET ACCOUNT, with a preservation letter under 18 U.S.C. § 2703(f), requesting that Microsoft preserve all electronically stored information in its possession regarding the TARGET ACCOUNT for a period of ninety days.

92.    CW1 communicated with ALLEN via email, specifically using the TARGET ACCOUNT, and confirmed that email is a common method of communication in the industry.

93.    The government received several emails to or from the TARGET ACCOUNT through CW1. These emails establish probable cause to believe that the TARGET ACCOUNT will contain records and communications relating to the TARGET OFFENSES.

94.    Specifically, ALLEN used the TARGET ACCOUNT to correspond regarding cancer genetic testing. For example, ALLEN used the TARGET ACCOUNT to correspond

regarding the Lotus Health requisitions, billing Medicare for performing cancer genetic testing, and payments between clinical laboratories and Archer for referring requisitions and samples.

95.     As discussed above, according to CW1, in May or June of 2018, ALLEN offered to sell 70 cancer genetic testing requisitions and DNA samples to Company 1. In the months leading up to that proposed transaction, ALLEN and CW1 communicated by email regarding cancer genetic testing.

96.     For example, on March 12, 2018, ALLEN emailed CW1, using the TARGET ACCOUNT, regarding "gene we need ran." This email listed 16 different genes for which, according to CW1, ALLEN intended to submit unbundled claims to Medicare for reimbursement, as opposed to a single "bundled" claim.

97.     Also on March 12, 2018, ALLEN emailed CW1 a spreadsheet. The spreadsheet listed all 32 individual genes tested in the Lotus Health comprehensive panel. Additionally, the spreadsheet listed the reimbursement amount expected to be paid by Medicare for testing of the individual genes if each of those tests was billed separately. For the comprehensive panel test, billed by each individual gene rather than as one bundled billing, the spreadsheet listed a total expected Medicare reimbursement amount of $6,588.97—all for cancer genetic testing performed on a single DNA swab for a single Medicare beneficiary, despite Medicare requirements that comprehensive cancer genetic testing panels derived from a single DNA swab be billed as a "bundled" test. According to CW1, again, ALLEN sent this email to CW1 to show the type of billing to Medicare that could be submitted for cancer genetic testing.

98.     On March 14, 2018, ALLEN sent an email to CW1, using the TARGET ACCOUNT, regarding "Preffered [*sic.*] Option.pdf." In his email, ALLEN attached a sample cancer genetic testing requisition that appears substantially similar to the requisition form shown

in Paragraph 54 above (but without any specific beneficiary information). This sample requisition is substantially similar to the 70 requisitions that ALLEN ultimately sent to CW1 in May or June of 2018. According to CW1, this sample requisition was provided to show CW1 how the process of obtaining requisitions for, testing for, and submitting claims to Medicare for cancer genetic testing worked, as part of a larger discussion of involving CW1 in the sale of requisitions by Archer for such testing.

99.    On March 15, 2018, ALLEN emailed CW1, using the TARGET ACCOUNT, and attached an unsigned contract between Archer and Clio, referenced in Paragraph 86 above, that contains an unlawful kickback agreement. According to CW1, this contract was emailed by ALLEN to CW1 to show how deals between Archer and clinical laboratories typically are structured, including the payment arrangement for Archer referring requisitions and samples to the clinical laboratories.

100.    On May 9, 2018, ALLEN sent an email to CW1, using the TARGET ACCOUNT, titled "Please forward," attaching a sample cancer genetic testing requisition. This requisition appears to be the same in all respects as the previous requisition just referenced, but instead includes the logo for Acadian (located within the Middle District of Louisiana) at the top of the form. Again, this sample requisition is substantially similar to the 70 requisitions that ALLEN ultimately sent to CW1 in May or June of 2018. According to CW1, this specific contract was emailed by ALLEN to CW1 to show that Acadian had previously accepted requisitions and samples referred by ALLEN, through Archer.

101.    On June 28, 2018, an employee in the logistics department at Company 1 emailed Epstein, asking for a signature needed from a physician before Company 1 could release test results to patients. After receiving no response, on July 13, 2018, the employee forwarded the email to

ALLEN (at the TARGET ACCOUNT), asking if ALLEN could "help getting these signatures," and listing five different physicians. On the same date, ALLEN, using the TARGET ACCOUNT, responded, "Yes ma'am." According to CW1, these signatures were never provided to Company 1.

102.    Emails provided by CW2 also establish probable cause to search the TARGET ACCOUNT. CW2, the owner of Company 4, a durable medical equipment in Louisiana, was interviewed by the government in June 2019. According to CW2, in 2018, ALLEN learned that CW2 owned Company 4. ALLEN approached CW2 multiple times regarding his interest in purchasing Company 4, and ALLEN also offered to get CW2 involved in cancer genetic testing. ALLEN told CW2 that he would send CW2 requisitions for genetic testing, which were obtained through telemarketing and other marketing tactics. All CW2 had to do was provide ALLEN with CW2's Medicare billing number. ALLEN had a separate entity through which he would use CW2's billing number to bill for cancer genetic testing and then collect the Medicare reimbursements, which would go directly into an account controlled by ALLEN. ALLEN wanted to keep 15% of the Medicare reimbursements collected on claims using CW2's billing number. CW2 specifically recalled that ALLEN targeted Medicare for this scheme because it routinely paid for cancer genetic testing and did not scrutinize the industry.

103.    CW2 provided to the government an email dated April 17, 2018 from Epstein to CW2, copying ALLEN at the TARGET ACCOUNT, regarding "Scripts." The email contained five attachments, which pertained to orders for durable medical equipment, namely, braces. The attachments included patient demographics, such as patients' names, dates of birth, contact information, height, weight, type of insurance (all Medicare), and the patients' supposed need for an elbow, wrist, shoulder, knee, or other brace. Based on information and belief, this information

was provided to CW2 as examples of Medicare beneficiaries who were contacted regarding their supposed need for durable medical equipment, but who also could be used to bill Medicare for cancer genetic testing. One of the physicians listed in the documents who attested to the supposed medical necessity of ordering a brace for a Medicare beneficiary, Dr. Sial Vakas, is the same physician who attested to the supposed medical necessity of a number of cancer genetic testing requisitions obtained by CW1 and reviewed by Affiant.

## IX.    TECHNICAL BACKGROUND AND ITEMS LIKELY TO BE FOUND

104.    Microsoft provides its subscribers, such as ALLEN, with internet-based accounts that allow them to send, receive, and store emails online. Microsoft's accounts are typically identified by a single username, which serves as the subscriber's default email address, but which can also function as a subscriber's username for other services, such as instant messages and remote photo or file storage.

105.    Based on my training and experience, I know that Microsoft allows subscribers to obtain accounts by registering on Microsoft's website. During the registration process, Microsoft asks subscribers to create a username and password, and to provide basic personal information such as a name, phone number, and in some cases a means of payment. Microsoft typically does not verify subscriber names. However, Microsoft does verify the email address or phone number provided.

106.    Once a subscriber has registered an account, Microsoft provides email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. Microsoft subscribers can also use that same username or account in connection with other services provided by Microsoft.

107.    In general, user-generated content (such as email) that is written using, stored on, sent from, or sent to a Microsoft account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an email, the email can remain on Microsoft's servers indefinitely. Even if the subscriber deletes the email, it may continue to exist on Microsoft's servers for a certain period of time.

108.    A subscriber's Microsoft account can be used not only for email but also for other types of electronic communication, including instant messaging, photo and video sharing, voice calls, video chats, and SMS text messaging. Depending on user settings, user-generated content derived from many of these services is normally stored on Microsoft's servers until deleted by the subscriber. Similar to emails, such user-generated content can remain on Microsoft's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Microsoft's servers for a certain period of time. Furthermore, a Microsoft subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on Microsoft's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a Microsoft account may be found within such computer files and other information created or stored by the Microsoft subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

109.    Based on my training and experience, I know that providers such as Microsoft also collect and maintain information about their subscribers, including information about their use of Microsoft services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to

connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as Microsoft also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as Microsoft typically collect and maintain location data related to subscribers' use of Microsoft services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

110.    Based on my training and experience, I know that providers such as Microsoft also collect information relating to the devices used to access a subscriber's account—such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Microsoft in order to track what devices are using Microsoft's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Microsoft accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a

particular device recovered during course of the investigation was used to access the Microsoft account.

111.    Based on my training and experience, I know that providers such as Microsoft use cookies and similar technologies to track users visiting Microsoft's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to Microsoft.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as Microsoft may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Microsoft account and determine the scope of criminal activity.

112.    Based on my training and experience, I know that Microsoft maintains records that can link different Microsoft accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Microsoft accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who used a particular Microsoft account.

113.    Based on my training and experience, I know that subscribers can communicate directly with Microsoft about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users. Providers such as Microsoft typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

114.    In summary, based on my training and experience in this context, I believe that the computers of Microsoft are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved email), as well as Microsoft-generated information about its subscribers and their use of Microsoft services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Microsoft with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

115.    Information stored in connection with a Microsoft account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a Microsoft account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further,

information maintained by Microsoft can show how and when the account was accessed or used. For example, providers such as Microsoft typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the Microsoft account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the Microsoft account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## X.    **RETENTION OF INFORMATION FOR AUTHENTICATION PURPOSES**

116.    In anticipation of litigation relating to the authenticity of data seized pursuant to the search warrant, the government requests that it be allowed to retain a digital copy of all seized information authorized by the warrants for as long as is necessary for authentication purposes.

## XI.    **CONCLUSION**

117.    Based on the forgoing, there is probable cause to believe that from in or around January 1, 2018, and continuing through the present, ALLEN and others conspired to commit the TARGET OFFENSES. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes, further described in Attachment B.

118.    Because the warrant will be served on Microsoft, who will then compile the

requested records at a time convenient to it, there exists reasonable cause to permit the execution

of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the

presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Wes Root
Special Agent
U.S. Department of Health and Human
Services – Office of Inspector General


Subscribed and sworn to before me on this _____ day of _August_ , 2019.


HONORABLE RICHARD L. BOURGEOIS, JR.
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF LOUISIANA

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the TARGET ACCOUNT identified by "mallen@mdxdiagnostics.net," which is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company that is headquartered and accepts service of legal process at One Microsoft Way, Redmond, Washington 98052.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be Disclosed By Microsoft Corporation (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any records that have been deleted but are still available to the Provider, or have been preserved pursuant to the request made under 18 U.S.C. § 2703(f) on May 22, 2019, the Provider is required to disclose the following information to the government corresponding to the TARGET ACCOUNT listed in Attachment A:

a.      The contents of emails associated with the account from January 1, 2018 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      Records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      Records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.      Records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## II.    Information to Be Seized by the Government

The information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program), those violations involving Mark ALLEN, from January 1, 2018 to the present, including, for the TARGET ACCOUNT listed in Attachment A, information pertaining to the following matters:

a.    Genetic testing.

b.    Records relating to patients or customers of businesses owned or controlled by Mark ALLEN, Richard Epstein, Kevin Hanley, George M. Fluitt III, Khalid Satary, Lotus Health Telemed LLC, Archer Diagnostics LLC, JL Medical LLC, Acadian Diagnostic Laboratories, LLC, Specialty Drug Testing, LLC, or Clio Laboratories, LLC, including the following types of records: patient files, treatment cards, recordings of telephonic conversations, patient ledger cards, patient complaints, physician notes, call center notes, medical assistant notes, genetic testing records, and original patient or referrals source listings.

c.    Documents constituting, concerning or relating to bills, invoices, and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

d.    Documents related to the referral of patients to or from Lotus Health Telemed LLC, Archer Diagnostics LLC, JL Medical LLC, Acadian Diagnostic Laboratories, LLC, Specialty Drug Testing, LLC, or Clio Laboratories, LLC.

e. Invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or businesses.

f. Contracts, billing agreements, professional services agreements, or any other contracts between the above-referenced individuals or businesses, and any other individual, company, physician or billing company.

g. Medicare handbooks, manuals, newsletters, or other Medicare publications.

h. Bank accounts, money market accounts, checking accounts, equity lines of credit, investment accounts, stock fund accounts, bonds, or bond funds, including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements and loan agreements.

i. Corporate, business and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Forms 1099.

j. Documents consisting, concerning or relating to current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements, and W-2 forms.

k. Receipt, transfer, or other disposition of proceeds.

l. Information relating to who created, used or communicated with the account regarding the offenses listed above, including records about their identities and whereabouts.

2



AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information Associated with the Account<br>"mallen@mdxdiagnostics.net" that Is Stored at Premises<br>Controlled by Microsoft Corporation | )<br>)<br>)  Case No.   19-**MJ-92**<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Middle_____ District of _____Louisiana_____
*(identify the person or describe the property to be searched and give its location)*:

The account identified by "mallen@mdxdiagnostics.net," which is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, as further described in Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before   *August 23, 2019*   *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Richard L. Bourgeois, Jr._____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *8/9/19 at 2:00pm*

City and state:      Baton Rouge, Louisiana

*Judge's signature*

Hon. Richard L. Bourgeois, Jr., U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the TARGET ACCOUNT identified by "mallen@mdxdiagnostics.net," which is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company that is headquartered and accepts service of legal process at One Microsoft Way, Redmond, Washington 98052.

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.      Information to be Disclosed By Microsoft Corporation (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any records that have been deleted but are still available to the Provider, or have been preserved pursuant to the request made under 18 U.S.C. § 2703(f) on May 22, 2019, the Provider is required to disclose the following information to the government corresponding to the TARGET ACCOUNT listed in Attachment A:

a.      The contents of emails associated with the account from January 1, 2018 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      Records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      Records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.      Records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## II.    Information to Be Seized by the Government

The information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program), those violations involving Mark ALLEN, from January 1, 2018 to the present, including, for the TARGET ACCOUNT listed in Attachment A, information pertaining to the following matters:

a.    Genetic testing.

b.    Records relating to patients or customers of businesses owned or controlled by Mark ALLEN, Richard Epstein, Kevin Hanley, George M. Fluitt III, Khalid Satary, Lotus Health Telemed LLC, Archer Diagnostics LLC, JL Medical LLC, Acadian Diagnostic Laboratories, LLC, Specialty Drug Testing, LLC, or Clio Laboratories, LLC, including the following types of records: patient files, treatment cards, recordings of telephonic conversations, patient ledger cards, patient complaints, physician notes, call center notes, medical assistant notes, genetic testing records, and original patient or referrals source listings.

c.    Documents constituting, concerning or relating to bills, invoices, and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

d.    Documents related to the referral of patients to or from Lotus Health Telemed LLC, Archer Diagnostics LLC, JL Medical LLC, Acadian Diagnostic Laboratories, LLC, Specialty Drug Testing, LLC, or Clio Laboratories, LLC.

e.     Invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or businesses.

f.     Contracts, billing agreements, professional services agreements, or any other contracts between the above-referenced individuals or businesses, and any other individual, company, physician or billing company.

g.     Medicare handbooks, manuals, newsletters, or other Medicare publications.

h.     Bank accounts, money market accounts, checking accounts, equity lines of credit, investment accounts, stock fund accounts, bonds, or bond funds, including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements and loan agreements.

i.     Corporate, business and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Forms 1099.

j.     Documents consisting, concerning or relating to current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements, and W-2 forms.

k.     Receipt, transfer, or other disposition of proceeds.

l.     Information relating to who created, used or communicated with the account regarding the offenses listed above, including records about their identities and whereabouts.